UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


ROBERT COMPION,                          )
                                         )
          Plaintiff,                     )
                                         )
     v.                                  )          No.  4:12CV0003AGF
                                         )                         (TIA)
MICHAEL J. ASTRUE,                       )
COMMISSIONER OF SOCIAL SECURITY,         )
                                         )
          Defendant.                     )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

     This cause is on appeal from an adverse ruling of the Social Security Administration.  The

case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. §

636(b).  The suit involves Applications for Disability Insurance Benefits under Title II of the

Social Security Act and Supplemental Security income payments.  Claimant has filed a Brief in

Support of his Complaint; the Commissioner has filed a Brief in Support of his Answer.

## I.     Procedural History

     Claimant Robert Compion filed Applications for Disability Insurance Benefits under Title

II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 100-03)[1] and Supplemental Security Income

payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr.104-

07).  Claimant states that his disability began on July 31, 2005, as a result of head injury, stress,

depression, anger, nervous condition, kidney problems, and inability to read and write.  (Tr. 152).

On initial consideration, the Social Security Administration denied Claimant's claims for benefits.

_____

[1]"Tr." refers to the page of the administrative record filed by the Defendant with its Answer
(Docket No. 10/filed March 16, 2012).

(Tr. 48-55). Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 56). On April 19, 2011, a hearing was held before an ALJ. (Tr. 25-44). Claimant testified and was represented by counsel. (Id.). Vocational Expert Delores Gonzalez also testified at the hearing. (Tr. 40-43, 84-87). Thereafter, on June 21, 2011, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 7-20). After considering counsel's letter of August 22, 2011, the Appeals Council on October 28, 2011 found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision. (Tr. 1-5, 98-99). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Hearing on April 19, 2011

#### 1. Claimant's Testimony

At the hearing on April 19, 2011, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 26-41). At the time of the hearing, Claimant was twenty-nine years of age. (Tr. 27). Claimant completed the ninth grade. (Tr. 28). Claimant had a driver's license, and he needed assistance with reading the test. (Tr. 28). Claimant stands at five feet ten inches and weighs 317 pounds. (Tr. 30). Claimant was born without one kidney. (Tr.30). Claimant is engaged. (Tr. 39).

Claimant has been convicted of not paying child support. (Tr.29). Claimant lost his driver's license due to nonpayment of child support. (Tr. 38).

In 2004, Claimant worked as a laborer for Latham Brothers Construction. (Tr. 29). Claimant also worked as a laborer at Reinhold Building Corporation. Claimant testified that he has not worked since 2007. Claimant testified that his boss at Alpha Omega fired him for

allegedly being late. (Tr. 29). Claimant testified that he was fired from his last two to three jobs due to overreacting in anger. (Tr. 36). At Latham Brothers his supervisor yelled at Claimant for placing boards in the wrong slot, and Claimant yelled back. (Tr. 37). His supervisor asked him to leave the job. At Air Max his employer yelled at him for burning a pile in the wrong location and when Claimant yelled back, his employer asked Claimant to leave. (Tr. 37).

Claimant testified that he has upper back problems causing difficulty sitting, standing, and moving as well as pain. (Tr. 30, 32). Claimant testified that sitting or standing for too long triggers his back pain. (Tr. 32). Claimant testified that he could tolerate sitting for thirty to forty minutes, and then he would have to stand and stretch. (Tr. 33). Claimant testified that he could stand for fifteen to thirty minutes. (Tr. 33). Claimant testified that he experiences pain even though he is taking pain medication. (Tr. 34). Laying down is the most comfortable position for Claimant. Claimant testified that he has to lay down ten to fifteen times during the day. (Tr. 34). Claimant testified he experiences numbness in his feet. (Tr. 34).

Dr. Ward provides psychological care for Claimant's anger and depression. (Tr. 31). Dr. Ourwari diagnosed Claimant with depression and ADHD. (Tr. 35). Claimant testified that his medication has helped with his anger issues. (Tr. 36). The day before Claimant overreacted in anger after his dog jumped on the bed with muddy feet. (Tr. 36).

Claimant testified that he visits a cousin's house sometimes and goes to his sister's house to use the phone. (Tr. 38). In response to the ALJ's questions, Claimant testified that he reported to the doctor at family services that he uses marijuana at least twice a month for the last eight to ten years. (Tr. 39). Because he had to take a drug test for treatment, Claimant testified that he stopped using marijuana sometime after November 2009. (Tr. 40). Claimant does not

drink alcohol, because his father was an abusive alcoholic. (Tr. 40).

## 2. Testimony of Vocational Expert

Vocational Expert Delores Elvira Gonzalez, a vocational rehabilitation counselor,

testified in response to the ALJ's questions. (Tr. 40-43).

The ALJ asked Ms. Gonzalez to assume

a hypothetical claimant, age 28 as of the protective filing date with nine years of education. Some past work experience. It's been opined that this hypothetical claimant could perform a full range of light work. He has limited reading and writing skills. He is able to understand, remember, and carry out only simple instructions and nondetailed tasks. Can respond appropriately to supervisors and coworkers in a task-oriented setting with contact with other as casual and infrequent. Should not work in a setting which includes constant or regular contact with the general public. Should not perform work which includes more than infrequent handling of customer claimants. Given those restrictions and those alone, could this hypothetical claimant return to any past relevant work?

(Tr. 42). Ms. Gonzalez opined that the hypothetical individual could not work at any past

relevant work inasmuch as his past work was very heavy. (Tr. 42). Ms. Gonzalez cited

housekeeper/cleaner, classified as light unskilled with 887,890 jobs nationally and 21,660 in

Missouri; and a bench assembler, classified as light and unskilled with 239,550 jobs nationally and

5,700 in Missouri as examples of other work that would fit into the hypothetical. (Tr. 42-43).

Next, the ALJ asked Ms. Gonzalez whether the July 7, 2010 Medical Source Statement

from Dr. Patrick Ourwari would allow Claimant to return to any past relevant work or any other

work. (Tr. 43, 247-49). Ms. Gonzalez testified no. (Tr. 43).


## 3. Open Record

At the end of the hearing, the ALJ noted how he would send Claimant to a doctor for

evaluation and IQ testing and hoped that counsel would submit some school records. (Tr. 43).

A review of the record shows that counsel submitted Claimant's school records as requested by the ALJ before he issued a decision denying Claimant's claims for benefits. (Tr. 43, 187-89, 193-95).

### 4. Forms Completed by Claimant

In the Disability Report - Adult completed by Claimant's sister, he reported being unable to work due to head injury, stress, depression, inability to read and write, kidney problems, nervous condition, and anger. (Tr. 148-49). Claimant reported he stopped working on August 31, 2007 after being fired for building a fire in the wrong location. (Tr. 150). Although Claimant stopped working for other reasons, he noted his conditions became severe enough to keep him from working since July 31, 2005. (Tr. 150). Claimant noted having an accident in July 2005 when he fell and hit his head on concrete at the river. (Tr. 154).

In the Function Report Adult - Third Party completed on February 12, 2010, Claimant's fiancé reported that he lives alone in a trailer. (Tr. 168). Claimant has no problems with his personal care, prepares his own meals, cleans his house, and does light laundry. (Tr. 167-68). Claimant goes out every day either walking or in a car. (Tr. 169). She indicated that Claimant has never been fired from a job because of problems getting along with other people. (Tr. 172).

In the Report of Contact, Sarah Mainord attempted to contact Claimant on January 20, 2010 and February 2, 2010, but he was not available. (Tr. 174).

### III. Medical Records

On September 14, 2004, Claimant received treatment for toe pain in the emergency room

at Jefferson Memorial Hospital.  (Tr. 210-12).

On August 21, 2005, Claimant received treatment in the emergency room at Jefferson Memorial Hospital for moderate neck and back pain as a result of a fall.  (Tr. 205-06).  The emergency room doctor diagnosed minor head trauma and prescribed medication as treatment.  (Tr. 207).  The Imaging Report showed straightening of Claimant's normal cervical lordotic curve.  (Tr. 208).  Dr. James Junker noted the image showed an otherwise unremarkable cervical spine.  (Tr. 208).  The CT scan of Claimant's head showed his head to be within normal limits.  (Tr. 209).

On September 25, 2007, Claimant received treatment at Jefferson Memorial Hospital for throat pain and nasal congestion.  (Tr. 203-04).

In the September 17, 2009, Medical Report, L. Butler of the Missouri Department of Social Services found Claimant to be disabled, and his expected duration of incapacity would last three to five months. (Tr. 222-23).

On November 16, 2009, Dr. Paul Rexroat completed a psychological evaluation of Claimant on referral by Family Support Division of Washington County.  (Tr. 216).  Claimant reported working as a carpenter laborer and construction laborer for three companies with his longest job lasting one year.  Claimant has worked a total of eighteen months in his life.  Claimant left his last job after falling and having a concussion.  Claimant has three children and has been convicted of failure to pay child support.  (Tr. 216).  Claimant started using marijuana at age twenty and still uses it once or twice a month.  (Tr. 217).  Claimant last smoked marijuana three weeks earlier.  Claimant reported never having been treated by a mental health professional and never having taken psychotropic medications.  Claimant reported having problems with anxiety as

long as he can remember. Dr. Rexroat noted Claimant to be alert and cooperative during the mental status examination. (Tr. 217). Dr. Rexroat found Claimant appeared to function intellectually at a below average range of intelligence and to be dependent on marijuana. (Tr. 218). With respect to functional limitations, Dr. Rexroat found Claimant to be able to understand and remember simple instructions and to sustain concentration and persistence with simple tasks, but he has mild limitations in his abilities to interact socially and adapt to his environment. As to activities of daily living, Claimant reported living by himself in a mobile home, cleaning, doing his own laundry, cooking, and watching television. Dr. Rexroat observed Claimant to exhibit adequate social skills during the evaluation. Claimant reported having two friends come by his house each day. (Tr. 218). Dr. Rexroat found Claimant's prognosis to be guarded and assessed his GAF to be 49. (Tr. 219).

On January 6, 2010, Claimant received treatment at the Simpelo Medical Clinic. (Tr. 273). Claimant reported having difficulty maintaining a job due to anger issues. Claimant reported having anxiety and depression for some time. The nurse practitioner prescribed Paxil, Xanax, and HCTZ and diagnosed Claimant with anxiety, depression, increased blood pressure, low back pain, and obesity. (Tr. 273). In a follow-up visit on January 18, 2010, Claimant reported feeling the same. (Tr. 274). The nurse practitioner made a referral for a psychiatric evaluation and increased his Paxil and Xanax prescriptions. (Tr. 274). The nurse practitioner encouraged Claimant to diet and exercise and to stop drinking soda. (Tr. 275). Claimant returned on January 25, 2010 for follow-up on his blood pressure. (Tr. 276). Claimant reported not feeling any different, but the nurse practitioner noted that his wife reported Paxil helping Claimant. The nurse practitioner increased his Paxil dosage and recommended that Claimant diet

and exercise.  (Tr. 276).

The January 12, 2010, x-ray of Claimant's lumbar spine showed five lumbar vertebral bodies, grade II anterolisthesis of L4 and L5 with bilateral para defects, and small osteophytes at T12-L1.  (Tr. 294).

On February 12, 2010, Claimant reported back pain starting at age fifteen after a fall and having not been previously significantly evaluated.  (Tr. 251).  Claimant reported lying down is not beneficial.  (Tr. 252).  Dr. William Hopkins of the Missouri Spine Center examined Claimant and found back pain in his lumbar spine, and his back motion to be restricted.  (Tr. 252).  Dr. Hopkins noted that straight leg raising caused "a little bit of back pain." Dr. Hopkins noted no spasms. (Tr. 252).  Dr. Hopkins discussed the possibility of some improvement with epidural steroids and the high probability of surgical intervention at some point in time.  (Tr. 253).  Dr. Hopkins also urged Claimant to lose weight "because it has such a great effect on possible complications if an operative procedure is a consideration, and also the success rate is diminished significantly."  (Tr. 253).  The x-ray of his lumbar spine showed L4-5 moderate spondylolisthesis and bilateral spondylolysis.  (Tr. 271, 291).  The x-ray further showed moderate lumbar spondylosis worse at L4-L5 level resulting in severe and moderate to severe left foraminal stenosis.  (Tr. 292).

On February 16, 2010, Claimant reported being treated by an orthopedic doctor and being prescribed Ultram.  (Tr. 277).  Claimant reported that the Ultram helped some until he fell on the ice.  The nurse practitioner referred Claimant to SSM weight loss.  (Tr. 277).

On February 17, 2010, Dr. Patrick Ourwari[2] first evaluated Claimant at Resolutions

_____

[2]The undersigned assumes the correct spelling of the doctor's name to be Ourwari, not Oruwari, inasmuch as Ourwari is the spelling used in the records from Resolutions Outpatient

Outpatient Behavioral Healthcare. (Tr. 304). Claimant reported responding in a violent manner over little things, having crying spells and panic attacks, and feeling hopeless. Claimant reported being unemployed and having applied for disability. In the past psych history, Dr. Ourwari noted that Claimant had never been treated by a psychiatrist. (Tr. 304).

In the Psychiatric Review Technique complete on March 1, 2010, Dr. James Morgan found Claimant's impairments of affective disorders, anxiety-related disorders, and substance addiction disorders not to be severe. (Tr. 225-32). In support, Dr. Morgan noted the finding that "there to be insufficient evidence available to make a determination on disability through the DLI." (Tr. 235). Dr. Morgan found Claimant to have moderate functional restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (Tr. 233).

Dr. Morgan completed a Mental Residual Functional Capacity Assessment on March 1, 2010 and opined although Claimant has diagnosis of a mental condition, "the evidence suggests that if he were to abstain from drug use his condition would improve. Claimant retains the capability to perform simple repetitive tasks on a regular basis." (Tr. 238). Dr. Morgan found Claimant to be moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, and to work in coordination with or proximity to others without being distracted by them. (Tr. 235). With respect to social interactions, Dr. Morgan found Claimant to be moderately restricted in his ability to interact appropriately with the general public, to accept instructions, to get along with coworkers or peers without distracting them, and to maintain socially appropriate behavior

Behavioral Healthcare.

and to adhere to basic standards of neatness. (Tr. 237). In support, Dr. Morgan cited the medical evidence on record specifically the examination by Dr. Rexroat and his finding Claimant able to understand and remember simple instructions, sustain concentration and persist with simple tasks and able to sustain concentration, persistence, and pace with simple tasks. (Tr. 238).

On March 3, 2010, Claimant complained of experiencing side effects from Adderall, but he reported feeling less depressed and less anxious but still having problems with concentration. (Tr. 303). Dr. Ourwari diagnosed Claimant with major depressive disorder, and ADHD and assessed his GAF to be 58-60. Dr. Ourwari discontinued Adderall medication and prescribed methylphenidate. (Tr. 303).

In a follow-up visit on March 5, 2010, Claimant returned with a current MRI. (Tr. 254). Dr. Hopkins noted that there are significant problems at the L4-L5 levels. Claimant has a collapsed disk and is grade 1 bordering on 2 spondylolisthesis. Dr. Hopkins further noted Claimant has central and foraminal stenosis at the L4-L5 level secondary to posterior enlargement. Dr. Hopkins recommended at least one lumbar epidural steroid injection. (Tr. 254). The March 5, 2010 MRI of Claimant's lumbar spine showed grade I anterolisthesis of L4 on L5 with bilateral pars defects without any significant interval changes since prior examination. (Tr. 269). The MRI also revealed moderate lumbar spondylosis worse at L4-L5 level resulting in severe right and moderate to severe left foraminal stenosis. (Tr. 270).

In a follow-up visit on March 9, 2010, Claimant reported having surgery in three weeks and the epidural helped some for one day. (Tr. 278). The nurse practitioner instructed Claimant to continue treatment with his psychiatrist and orthopedist. (Tr. 278). On March 18, 2010,

Claimant returned for treatment, and the nurse practitioner prescribed medications and instructed Claimant to continue with weight loss. (Tr. 279). During a medication check up on April 8, 2010, the nurse practitioner refilled his Percocet prescription and encouraged Claimant to try to lose weight. (Tr. 280).

In a follow-up visit on April 8, 2010, Dr. Simpelo found Claimant to have chronic back pain and urged him to lose weight. (Tr. 280). Claimant returned for a medication refill of Percocet. (Tr. 280).

On April 9, 2010, Claimant returned to Dr. Hopkins' office after one epidural steroid injection. (Tr. 256). After discussing the injection, Dr. Hopkins recommended Claimant be evaluated by Dr. Kuhns in regard to his spondylolisthesis and his related symptoms. (Tr. 256).

Claimant returned to Dr. Simpelo's office on April 14, 2010 to review the results of the MRI and reported not having taken his blood pressure medication that day. (Tr. 281). The nurse practitioner noted that Claimant has an appointment with an orthopedist to discuss the possibility of surgery. The nurse practitioner encouraged Claimant to continue his weight loss and to take his blood pressure medications daily. (Tr. 281). On May 5, 2010, Claimant returned for a review of his pain medication. (Tr. 282). Claimant reported experiencing severe pain in his lower back. The nurse practitioner refilled his pain medication. (Tr. 282).

Dr. Michael Welsley evaluated Claimant on May 13, 2010. (Tr. 258). Claimant reported having back pain for the last eleven years. (Tr. 258). Dr. Welsley noted Claimant to be morbidly obese and had been asked to lose weight. (Tr. 259). Claimant reported his whole family to be obese, and he has been obese since the second grade. Claimant noted that he has applied for disability. (Tr. 259). Examination showed a normal affect. (Tr. 260). Dr. Welsley found

Claimant to have an obese back with pain isolated to the L4-5 region midline. Dr. Welsley noted Claimant not to have any step-off but he noted difficulty in assessing due to Claimant's morbid obesity. Dr. Welsley noted Claimant to have 5/5 strength in all major muscle groups. (Tr. 260).

On referral by Dr. Hopkins, Dr. Craig Kuhns evaluated Claimant on May 13, 2010. (Tr. 262). Dr. Kuhns concurred with Dr. Welsley's findings. (Tr. 262). Claimant reported the epidural steroid injection made him feel worse. (Tr. 263). Examination showed Claimant to have a body mass index of 46. Dr. Kuhns noted that the MRI showed foraminal stenosis at 4-5. Dr. Kuhns opined that Claimant's complaints and other pains "may be attributed more to his overall general poor health." Dr. Kuhns noted Claimant's strength to be 5/5. (Tr. 263). In the assessment, Dr. Kuhns found Claimant to have a grade 2 isthmic spondylolisthesis at 4-5 which does appear to be very mobile and likely causing some radicular pain in his bilateral lower extremities with foraminal stenosis. Dr. Kuhns recommended Claimant lose weight, and if he loses weight then he would recommend a L4-L5 transforaminal lumbar interbody fusion. (Tr. 263). The CT of Claimant's abdomen showed no right kidney. (Tr. 265).

Claimant returned to Dr. Simpelo's office on May 27, 2010 and reported he is trying to lose weight. (Tr. 283). On June 3, 2010, Claimant returned for medication refills. (Tr. 284). Dr. Simpelo noted Claimant to have hypertension, chronic low back pain, and obesity. Dr. Simpelo continued Claimant's medication regimen. (Tr. 284).

On June 30, 2010, Claimant returned for a follow-up visit and reported "[e]verything is doing good." (Tr. 302). Claimant denied any symptoms of depression and anxiety and expressed an intent to do something that day. Dr. Ourwari assessed his GAF to be 60. (Tr. 302).

On July 7, 2010, Claimant returned for follow-up treatment with Dr. Simpelo for low back

pain, anxiety, depression, and obesity. (Tr. 285). Dr. Simpelo refilled his medications including Percocet. Claimant reported feeling well. (Tr. 285).

In the July 7, 2010 Medical Assessment of Ability to do Work-Related Activities, Dr. Patrick Ourwari found Claimant to have poor/none ability to relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stresses, and maintain attention/concentration and fair ability to relate to coworkers and function independently. (Tr. 248). With respect to making performance adjustments, Dr. Ourwari found Claimant to have fair/none ability to understand, remember, and carry out complex instructions and fair ability to understand, remember, and carry out detailed but not complex instructions and simple instructions. (Tr. 248). With respect to making personal-social adjustments, Dr. Ourwari found Claimant to have fair/none ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (Tr. 249). Dr. Ourwari noted symptoms to include delusions, paranoid thoughts, hallucinations, anger outbursts, and severe depression. Dr. Ourwari opined his prognosis to be fair. (Tr. 249).

On August 9, 2010, Claimant returned for a Percocet refill. (Tr. 286). Dr. Simpelo noted Claimant to have chronic back pain, obesity, anxiety, depression, and ADHD. (Tr. 286). In a follow-up visit on September 3, 2010, Dr. Simpelo refilled his Percocet prescription. (Tr. 287).

In the office visit on September 29, 2010, Claimant reported overall doing better and able to cope better in stressful situations. (Tr. 301). Claimant still becomes agitated. Dr. Ourwari diagnosed Claimant with ADHD and IED and assessed his GAF to be 65. (Tr. 301). On December 17, 2010, Claimant reported anger problems, bad depression, and having knocked out sixteen of his father's teeth. (Tr. 300). Claimant indicated that he cannot control his anger. Dr.

- 13 -

Ourwari observed Claimant to be tearful, well groomed, and obese and to have very poor impulse control. Dr. Ourwari diagnosed Claimant with major depressive disorder, IED, antisocial and paranoid personality disorder and assessed his GAF to be 42. Dr. Ourwari prescribed Adderall, Trazodone, Risperdal, and Xanax and continued Paxil. (Tr. 300).

On February 17, 2011, Claimant reported hyperextending his knee when mowing last night, and he requested a Percocet refill. (Tr. 288). Examination showed tenderness and swelling of the right knee. Dr. Simpelo prescribed medications. (Tr. 288).

On February 21, 2011, Claimant reported everything being good, and he had a period of one week where he was off his medications and the difference was clear. (Tr. 299). Claimant stated he cannot work because of his anger problems. Dr. Ourwari diagnosed Claimant with ADHD, IED, antisocial personality traits, chronic back pain, and mental disorder and assessed his GAF to be 65. Dr. Ourwari prescribed Xanax, Trazodone, Paxil, and Adderall as treatment. (Tr. 299).

On March 2, 2011, Claimant returned for a disability evaluation at Dr. Simpelo's office, and Claimant reported experiencing headaches and hearing problems and seeing black spots. (Tr. 289). During a follow-up visit on March 10, 2011, Claimant requested a Percocet refill and reported nasal congestion. (Tr. 290). Dr. Simpelo refilled his medications and noted Claimant to have chronic low back pain, ADHD, and hypertension. (Tr. 290).

On May 16, 2011, Dr. Thomas Spencer completed a psychological evaluation on referral from the Department of Social Services Disability Determinations. (Tr. 308). Claimants chief complaints included back pain, inability to read and write, and mental anger issues. At the outset of the interview, Dr. Spencer observed that Claimant did not appear to be in a great deal of

physical distress, but noted he seemed to become increasingly uncomfortable as the interview progressed. Claimant reported meeting with a neurosurgeon but being told he was overweight and no surgery could be performed until he lost at least fifty pounds. (Tr. 308). Claimant reported recently becoming engaged. (Tr. 309). Claimant denied a history of inpatient psychiatric treatment. Dr. Spencer noted that the records show Claimant was seen by a psychiatrist in late 2009 for Medicaid eligibility and was diagnosed with major depression and generalized anxiety disorder. Claimant has been seeing his current psychiatrist for eighteen months. (Tr. 309). Claimant has a girlfriend of seven to nine years, and they have a five-year old son together. (Tr. 310). Claimant reported a history of marijuana use, but he claimed he has been clean for eight months "because he had to undergo UA's for his primary care physician because of the pain killers." (Tr. 310). As to daily activities, Claimant mainly sits around and occasionally goes fishing, but he no longer hunts because of his felony conviction. Examination showed Claimant to be cooperative but his insight and judgment to be poor. Dr. Spencer observed Claimant to be alert and oriented to person, place time, and event, and his flow of thought was intact and relevant. Dr. Spencer further noted that Claimant "did not present as paranoid, hyper vigilant, suspicious, or grandiose." (Tr. 310). IQ testing showed Claimant to have a full scale IQ of 62, placing Claimant in the extremely low range of intellectual functioning, and Dr. Spencer opined that Claimant functions in the borderline range of intelligence. (Tr. 311). Dr. Spencer listed mood disorder, cannabis abuse by history, borderline intellectual functioning (probable), and occupational and economic problems as his diagnostic formulation and assessed his GAF to be 50 to 55. (Tr. 310). Dr. Spencer noted that although Claimant has been symptomatic for a long time, Claimant has no history of inpatient psychiatric treatment. Based on his review of the

records and interview of Claimant, Dr. Spencer opined that Claimant meets the criteria for a

mood disorder not otherwise specified, and he may need some assistance in managing his benefits.

(Tr. 312).

In the May 17, 2011 Medical Source Statement of Ability to do Work-Related Activities

(Mental), Dr. Spencer found Claimant to have moderate limitations in his ability to carry out

complex instructions, to understand and remember complex instructions, and to make judgments

on complex work-related decisions. (Tr. 305). Dr. Spencer found Claimant to be moderately

limited in his ability to interact appropriately with coworkers and supervisors and to respond

appropriately to usual work situations and to changes in routine work setting. (Tr. 306).

## IV.    The ALJ's Decision

The ALJ found that Claimant meets the insured status requirements of the Social Security

Act through March 31, 2009. (Tr. 12). The ALJ found that Claimant has not engaged in

substantial gainful activity since July 31, 2005, his alleged onset date of disability. (Tr. 12). The

ALJ found that the medical evidence establishes that Claimant has the severe impairments of

disorders of the spine, obesity, major depressive disorder, generalized anxiety disorder, borderline

intellectual functioning, and history of cannabis dependence, but no impairment or combination of

impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No.

4. (Tr. 12-16). The ALJ opined that Claimant has the residual functional capacity to perform

light work, but he is limited in terms of his reading and writing skills. (Tr. 16). The ALJ found

Claimant would be able to understand, remember and carry out at least simple instructions and

non-detailed tasks, and he would be able to respond appropriately to supervisors and coworkers

in a task-oriented setting where contact with others is casual and infrequent. (Tr. 16-17). The

ALJ further noted that Claimant should not work in a setting which includes constant and/or regular contact with the general public, and he should not perform work which includes more than infrequent handling of customer complaints. (Tr. 17). The ALJ found that Claimant is unable to perform any past relevant work. (Tr. 18).

The ALJ found Claimant was born on May 19, 1981 making him twenty-four years old and thus defined as a younger individual age 18-49 on the alleged disability onset date. (Tr. 18). The ALJ found Claimant to have a limited education and able to communicate in English. (Tr. 18). The ALJ noted that the transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Claimant is not disabled whether or not Claimant has transferrable job skills. (Tr. 18-19). Considering Claimant's age, education, work experience, and residual functional capacity, the ALJ opined that there are jobs that exist in significant numbers in the national economy and the state of Missouri that Claimant can perform such as a housekeeper/cleaner and bench assembler. (Tr. 19). The ALJ concluded that Claimant has not been under a disability from July 31, 2005, through the date of the decision. (Tr. 19).

## V. Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the

claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other

work in the national economy will she be found disabled.  20 C.F.R. § 404.1520(f); see also

Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be

affirmed if they are supported by "substantial evidence on the record as a whole."  Pearsall, 274

F.3d at 1217.  Substantial evidence has been defined as "less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a decision."  Id.  The court's review

"is more than an examination of the record for the existence of substantial evidence in support of

the Commissioner's decision, we also take into account whatever in the record fairly detracts

from that decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The Court will

affirm the Commissioner's decision as long as there is substantial evidence in the record to

support his findings, regardless of whether substantial evidence exists to support a different

conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative

record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to
        exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the
        claimant's impairments.

6.      The testimony of vocational experts when required which
        is based upon a proper hypothetical question which sets forth the claimant's
        impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred in formulating the RFC by failing to include additional limitations supported by the record, by failing to account for his anger outbursts, and by making erroneous inference when analyzing the records and opinions. Claimant also contends that the

ALJ failed to properly analyze his back impairment and failed to include additional exertional limitations in the RFC supported by the record. Next, Claimant contends that the ALJ failed to properly develop the record by failing to order an additional IQ test and erred by rejecting the IQ score determined by the consultative examiner.

A.    Residual Functional Capacity

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred in formulating the RFC by failing to include additional limitations supported by the record, by failing to account for his anger outbursts, and by making an erroneous inference when analyzing the records and opinions. In formulating the RFC, the ALJ found Claimant capable of performing light work, but he is limited in terms of his reading and writing skills. The ALJ found Claimant able to understand, remember and carry out at least simple instructions and non-detailed tasks and able to respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent. The ALJ further found Claimant should not work in a setting which includes constant and/or regular contact with the general public or more than infrequent handling of customer complaints.

A claimant's RFC is what he can do despite his limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). The claimant has the burden to establish his RFC. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger, 390 F.3d at 591; 20 C.F.R. § 404.1545(a). The ALJ is "required to consider at least some supporting evidence from a [medical

professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace.  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (internal quotation marks and citation omitted).  An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand.  Id.

In his decision the ALJ thoroughly discussed the medical evidence of record, his daily activities, his felony conviction, Claimant's testimony, and  his poor earnings record.  See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities).  The ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

Specifically, the record shows that no treating or consultative physician in any treatment notes stated that Claimant was disabled or unable to work or imposed significant long-term physical and/or mental limitations on Claimant's capacity for work.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints).  The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints.  See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical

basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints).

In support of his credibility findings, the ALJ noted that no physician who examined Claimant found him to have limitations consistent with disability. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined [claimant] submitted a medical conclusion that she is disabled and unable to perform any type of work."). The lack of medical evidence supporting Claimant's complaints was a proper consideration when evaluating his credibility, see Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006), as was his failure to pursue more aggressive treatment. See Tate v. Apfel, 167 F.3d 1191, 1197 (8th Cir. 1999). In addition, the ALJ noted that no physician had ever made any medically necessary restrictions, restrictions on his daily activities, or functional limitations. Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996) (lack of significant medical restrictions imposed by treating physicians supported the ALJ's decision of no disability). Likewise, the ALJ noted how the medical record is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment. Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993)( lack of ongoing treatment is inconsistent with complaints of disabling condition).

The ALJ placed nominal weight on the July 7, 2010 Medical Assessment of Ability to do Work-Related Activities completed by Dr. Ourwari wherein he found Claimant to have poor/none abilities to function in ten our of fifteen listed mental work-related aptitudes and only fair abilities in the five other categories.

A treating physician's opinion may be, but is not automatically, entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2). Controlling weight may not be given unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. SSR 96-2P, 1996 WL 374188 (July 2, 1996). Even a well-supported medical opinion will not be given controlling weight if it is inconsistent with other substantial evidence in the record. Id. "The record must be evaluated as a whole to determine whether the treating physician's opinion should control." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009). When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010( (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). "A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Perkins v. Astrue, 2011 WL 3477199, *2 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009)). The ALJ is charged with the responsibility of resolving conflicts among the medical opinions. Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008).

Additionally, Social Security Ruling 96-2p states in its "Explanation of Terms" that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, at *2 (S.S.A. July 2, 1996). SSR 96-2 clarifies that 20 C.F.R. §§ 404.1527 and 416.927 require the ALJ to provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

The ALJ found "the record non-supportive of the limitation advanced by Dr. Ourwari."

First, the ALJ noted that Dr. Ourwari's own treatment notes do not support the level of limitation set forth in the assessment. Next, the ALJ noted that the assessment was not accompanied by any treatment records. The undersigned also notes that the medical source opinion was completed one month after last being treated by Dr. Ourwari and at that time Claimant denied any symptoms of depression and anxiety, and he reported "[e]verything is doing good." Dr. Ourwari assessed his GAF to be 60. Likewise, the ALJ noted "the detailed reports of Dr. Ourwari's care contain only isolated references to adverse findings and certainly nothing to support the above level of limitation." (Tr. 18).

The ALJ found that Dr. Ourwari's assessment of July 7, 2010 was not entitled to controlling weight, because it was inconsistent with his prescribed medical treatment. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."). Likewise, as noted by the ALJ, Dr. Ourwari's opinion is inconsistent with his own treatment notes. Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."). An ALJ may "discount or even disregard the opinion of a treating physician ... where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); Hackler v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). Indeed, in his treatment notes Dr. Ourwari never set forth any specific limitations. Dr. Ourwari's treatment notes do not reflect the degree of limitation he noted in his July 7, 2010 assessment. The undersigned concludes that the

ALJ did not err in affording little weight to Dr. Ourwari's opinion of July 7, 2010.

The undersigned finds that the ALJ accounted for Claimant's alleged anger problems by limiting him to a task-oriented setting where contact with others is casual and infrequent, work that did not include constant and/or regular contact with the public, and work that did not include more than infrequent handling of customer's complaints. In the February 12, 2010, Function Report, Claimant's friend indicated that he had never been fired from a job due to problems getting along with other people. Likewise, Claimant indicated that he was fired from certain jobs but not due to his alleged disabling impairments. During the hearing, Claimant testified that he had been fired for being late from one job, for building a fire in the wrong location, and for placing boards in the wrong slot and yelling back at his supervisor from another job. The undersigned finds that the ALJ properly considered that Claimant did not stop working due to his alleged disability. Leaving work for reasons unrelated to an alleged disabling impairment weighs against a finding of disability. Medhaug v. Astrue, 578 F.3d 805, 816-17 (8th Cir. 2009); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992).

Next, the ALJ considered Claimant's felony conviction and history of polysubstance abuse. Claimant has felony conviction for nonpayment of child support.

The ALJ found "significant the claimant's continued ability to engage in a variety of daily activities. It is the report of the claimant's friend, Jessica Darnell, that he retains the ability to attend to personal care activities, prepare meals, do some household cleaning, do laundry, and shop in stores." (Tr. 17). Likewise the undersigned notes that Claimant during the May 16, 2011 evaluation by Dr. Spencer reported his daily activities included sitting around and occasionally going fishing, but no longer hunting because of his felony conviction. During the evaluation by

Dr. Rexroat, Claimant reported living by himself in a mobile home, cleaning, doing his own laundry, cooking, watching television, and having two friends come by his house each day. The record supports the ALJ's finding that Claimant's activities of daily living called into question the credibility of his subjective statements. Medhaug v. Astrue, 578 F.3d 805, 816-17 (8th Cir. 2009) (finding the claimant performed daily activities and chores that were inconsistent with his complaints of pain).

Finally, the ALJ noted that Claimant's work history and earnings record severely detract from his credibility regarding the severity of his impairments alleged and his overall motivation to work versus motivation for benefits inasmuch as his record documents poor and overall inconsistent earnings. The ALJ noted that "[t]he claimant's poor work record detracts from a finding that disability is the cause of his present inability to work." (Tr. 17). A poor work history lessens a Claimant's credibility. Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993); see also Ramirez v. Barnhart, 292 F.3d 576, 581-82 (8th Cir. 2002) (poor work record and financial motivation for benefits may contribute to adverse credibility determination when other factors cast doubt upon claimant's credibility); Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (a poor work history "may indicate a lack of motivation to work, rather than a lack of ability."); Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (low earnings and significant breaks in employment cast doubt on complaints of disabling symptoms).

Although Claimant testified at the hearing that he has to lie down ten to fifteen times during the day, there is no objective medical evidence substantiating Claimant's need to lie down. See e.g., Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that

medical condition required claimant to lie down for hours each day). Indeed, the record shows that there is no objective medical evidence substantiating Claimant's need to lie down ten to fifteen times during the day. Further, the record shows Claimant never reported to any doctors his need to lie down throughout the day. Indeed, during one examination, Claimant reported lying down is not beneficial. Likewise, no doctor determined Claimant needed to lie down ten to fifteen times during the day as a medical necessity. Thus, if Claimant was not lying down out of medical necessity, he must be doing so out of choice. See Craig v. Chater, 943 F. Supp. 1184, 1188 (W.D. Mo. 1996); Cf. Harris v. Barnhart, 356 F.3d 936, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day). These observations are supported by substantial evidence on the record as a whole.

After engaging in a proper credibility analysis, the ALJ incorporated into Claimant's RFC those impairments and restrictions found to be credible. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record."). In relevant part, the ALJ restricted Claimant to unskilled work. The ALJ further found Claimant to be capable of performing light work, but he is limited in terms of his reading and writing skills. The ALJ found Claimant able to understand, remember and carry out at least simple instructions and non-detailed tasks and able to respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent. The ALJ further found Claimant should not work in a setting which includes constant and/or regular contact with the general public or more than infrequent handling of customer complaints.

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible. Although the ALJ did not explicitly discuss each Polaski factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court. Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. See Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. See Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included the medical evidence of record, his daily activities, his felony conviction, Claimant's testimony, and his poor earnings

record.  The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination.  See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.      Back Impairment

Claimant also contends that the ALJ failed to properly analyze his back impairment and failed to include additional exertional limitations in the RFC supported by the record.

The ALJ considered Claimant's allegations of disabling back pain and found the allegations credible to the extent that he limited Claimant to light exertional work.  In relevant part, the ALJ found as follows:

> the imaging work-up of this period (to include radiographs and an MRI) revealed finding for Grade 1 anterorlisthesis at L4-5 with bilateral pars defect; and moderate lumbar spondylsosis which was worse at the L4-5 level, resulting in severe right and moderate to severe left foraminal stenosis. ...  While the above findings on examination and imaging workup are certainly supportive of a finding for limitation, the Administrative Law Judge notes that they cannot be considered in absence of fact that examinations of this period contain reference to no spasms and indicate the claimant to have been possessive of full strength (graded 5/5) in all his extremities.

> During course of the above care, and continuing until at least March 2011, the record documents that the claimant additionally was medically followed by a Rustico V. Simpelo, M.D., of the Austin Plaza Primary Care Clinic.  Although the

claimant was continued throughout course of this care with a diagnosis of back pain, the Administrative Law Judge notes that the reports of examination conducted consistently fail to reference adverse musculoskeletal or neurological deficits of functioning, ..., a fact incongruous with a finding for disability on basis of physical impairment.

(Tr. 13) (internal citations omitted).

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2) (2000)). Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000).

The ALJ concluded that the objective medical evidence did not bolster Claimant's credibility regarding the severity of his back pain. As discussed in regard to Claimant's credibility, an ALJ may discount a Claimant's complaints of pain based on the absence of objective medical evidence to support the complaints. Further, the ALJ addressed Claimant's credibility and concluded that factors such as the medical evidence of record, his daily activities, his felony conviction, Claimant's testimony, and his poor earnings record did not bolster his credibility in regard to the severity of his pain. As such, the undersigned finds the ALJ's determination that Claimant's back pain was not severe is supported by substantial evidence. See Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007); Warren, 29 F.3d at 1291.

Based on the objective medical evidence, the ALJ found that "[w]hile the above findings

on examination and imaging workup are certainly supportive of a finding for limitation, ... they cannot be considered in absence of fact that examinations of this period contain reference to no spasms and indicate the claimant to have been possessive of full strength (graded 5/5) in all his extremeties.

The substantial evidence on the record as a whole supports the ALJ's decision. See Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007) (finding that substantial evidence supported the ALJ's decision where there were too many inconsistencies in the case). Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

C.     The ALJ's Duty to Develop the Record

Claimant additionally argues that the ALJ violated his duty to develop a full and fair record by failing to order an additional IQ test and by rejecting the IQ score determined by the consultative examiner.

A social security hearing is a non-adversarial proceeding, and thus an ALJ has a duty to develop the record fully, including seeking clarification from treating physicians if a crucial issue is underdeveloped or undeveloped. See Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006); Garza v. Barnhart, 397 F.3d 1087, 1089-90 (8th Cir. 2005) (ALJ's duty to develop record fully and fairly exists even when claimant is represented by counsel). Nonetheless, "the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Jones v. Astrue, 619 F.3d 963, 969 (8th Cir. 2010) (citations omitted); accord Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

An ALJ's duty to develop the record arises only if a crucial issue was undeveloped. The record contains medical evidence from the relevant time period regarding Claimant's alleged disabilities. See Onstead v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993) (reversal due to failure to develop the record is warranted only where the failure is unfair or prejudicial). The ALJ opined as follows:

> While the claimant's performance on this testing is noted to have resulted in Scale IQ score of 62, a score which would place him in the Extremely Low Range of intellectual functioning, the Administrative Law Judge notes it to have been the opinion of Dr. Spencer that said results likely were an underestimate of the claimant's actual abilities. Dr. Spencer specifically noted to have believed the claimant to actually be functioning at the Borderline and possibly Low Average Range.

(Tr. 15). In support of Dr. Spencer's opinion, the ALJ noted how in the evaluation, Dr. Spencer listed mood disorder, cannabis abuse by history, borderline intellectual functioning (probable), and occupational and economic problems as his diagnostic formulation and assessed his GAF to be 50 to 55 placing Claimant in the moderate to borderline range.[3] The ALJ further noted how Claimant's school records appear to show Claimant was enrolled in regular classes even though he alleged he was enrolled in special education classes. Further, the ALJ noted how Claimant admitted he passed the written test to obtain his driver's license. Likewise, in his evaluation Dr. Rexroat's finding that Claimant appeared to function intellectually at a below the average range of

---

[3]Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32.

intelligence also supports Dr. Spencer's opinion that Claimant's IQ testing was likely an underestimate of his actual abilities. In his last treatment note, Dr. Ourwari assessed Claimant's GAF to be 65. See Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) ("[A] GAF score of 65 [or 70] ... reflects 'some mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well, has some meaningful interpersonal relationships.'") (quoting Kohler v. Astrue, 546 F.3d 260, 263 (2d Cir. 2008)). Accordingly, the undersigned finds that the ALJ properly determined Claimant had borderline intellectual functioning and not a greater impairment of intellectual functioning based on all of the relevant evidence of record.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in

a waiver of the right to appeal questions of fact. <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir.

1990).

/s/ Terry I. Adelman             
UNITED STATES MAGISTRATE JUDGE

Dated this   4th   day of February, 2013.